UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X

OMAR WILLOCK,

    *Petitioner*,

   -*against*-

DANIEL F. MARTUSCELLO, JR.,
SUPERINTENDENT OF COXSACKIE
CORRECTIONAL FACILITY;

    *Respondent*.

---------------------------------X

**MEMORANDUM & ORDER**

17-cv-00454(KAM)(LB)

**KIYO A. MATSUMOTO, United States District Judge:**

   Petitioner Omar Willock ("petitioner"), proceeding *pro se*, filed a petition for a writ of *habeas corpus* on January 13, 2017.  Petitioner challenges the constitutionality of his 2009 state court conviction for Murder in the Second Degree, which resulted in a custodial sentence of twenty-three years to life. The petitioner asserts his conviction and sentence were unconstitutional because: (1) the verdict was against the weight of the evidence; (2) the trial judge precluded exculpatory identification evidence; (3) the trial court's supplemental instructions on the element of intent deprived petitioner of a fair trial and his right to due process; and (4) petitioner received an unconstitutionally harsh and excessive sentence that failed to consider his youth and attendant circumstances.  (ECF No. 1, Petition for Writ of *Habeas Corpus* ("Pet.") 14-25.)  The

respondent, Daniel F. Martuscello ("respondent"), opposes petitioner's claims as procedurally barred and entirely without merit.  (ECF No. 5, Affidavit and Memorandum of Law in Opposition to Petition for Writ of *Habeas Corpus*.)[1]  For the reasons discussed below, the petition is denied and dismissed in its entirety.

## BACKGROUND

### I.   The Homicide

On May 12, 2007, at approximately 12:30 a.m., petitioner engaged in a physical altercation in front of 840 St. Marks Avenue in Brooklyn, NY, which resulted in the death of Roberto Duncanson, the victim, after petitioner referred to him as a "faggot."  (ECF No. 5-1, *People v. Willock*, Indictment No. 4741/07 (Kings County Crim. Ct.), Trial Transcript ("Trial Tr."), 33:5-7, 44:16-23, 61:1-2.)[2]  Belinda Toon, petitioner's neighbor, and Jeimar Brown, the victim's cousin, witnessed the fatal confrontation.  (*Id.* 44-45; 191-96.)  Toon attempted, in

---

[1]    Respondent's filing includes an Affidavit in Opposition to the petition, available at ECF No. 5, ECF pp. 1-18 ("Aff. in Opp."), and a Memorandum of Law in Opposition to the petition, available at ECF No. 5, ECF pp. 19-34 ("Opp.").

[2]    The caption "Trial Tr." refers to the criminal trial proceedings in *People v. Willock*, dated March 10 through March 18, 2009.  The trial transcripts are available at ECF No. 5-1, and ECF No. 5-2, and correspond to the trial dates as follows: ECF No. 5-1, ECF pp. 97-213 (March 10); ECF pp. 214-355 (March 11); ECF No. 5-2, ECF pp. 1-91 (March 12); ECF pp. 92-98 (March 13); ECF pp. 99-118 (March 16); ECF pp. 119-26 (March 17); ECF pp. 127-37 (March 18).  Citations to the trial proceedings from March 10 through March 18 correspond to the transcript pagination (1 to 392).  In addition, the transcript for pre-trial proceedings and jury selection, which occurred on March 9, 2009 ("Pre-trial Tr."), is available at ECF No. 5-1, ECF pp. 1-96.

vain, to restrain petitioner from fighting Duncanson.  (*Id.*
44:17-19.)  After petitioner "started to tussle" with Duncanson,
he began to land what appeared to be punches, but, as it turns
out, "he was actually stabbing [Duncanson] in his lower
abdomen."  (*Id.* 191:16-18.)  Duncanson, who was not armed,
suffered five stab wounds.  (Aff. in Opp. 3; *see also* Trial Tr.
192:20-22.)  After Duncanson was stabbed, Brown witnessed the
assailant attempt to conceal a knife before taking flight along
St. Marks Avenue toward New York Avenue.  (Trial Tr. 195:8-
196:9.)  Brown was unable to get a clear view of the petitioner,
given the late hour, and was thus unable to identify him as
Duncanson's attacker at a lineup held days after the incident.
(*Id.* 198:25, 202-03.)

        NYPD Officers from the 77th Precinct arrived at the
scene at approximately 12:40 a.m., and found Duncanson lying
unresponsive on the ground, surrounded by onlookers. (Trial Tr.
26-27.)  An ambulance brought Duncanson to the nearby hospital,
where he was pronounced dead at 1:09 a.m.  (*Id.* 14.)[3]  Meanwhile,
the police drove around the neighborhood, with Brown, searching
for the assailant, but they could not find him.  (*Id.* 201:11-
22.)

---

[3]     An autopsy performed the next day confirmed that Duncanson died from
the stab wounds he suffered during the fight with petitioner.  (*Id.* 105;
115:2-4.)  As a result, Duncanson's death was ruled a homicide.  (*Id.* 115.)

Detective Thomas McKiernan arrived to the crime scene at 12:50 a.m., and began canvassing the area, taking note of blood stains in between parked cars, and on a white sweater, which belonged to Toon.  (*Id.* 128.)  After learning of Duncanson's death, Detective McKiernan returned to the scene, searched for nearby video surveillance, and interviewed neighbors to ask what occurred.  (*Id.* 129.)  Eventually, Detective McKiernan found a security camera located at 810 St. Marks Avenue, which had captured footage of the incident.  (*Id.*)  The footage, as Toon and Brown described it at trial, showed Brown and Duncanson walking along St. Marks Avenue, Toon unsuccessfully grabbing petitioner to keep him from following them, Toon and petitioner disappearing off-screen in the same direction as Brown and Duncanson, and petitioner reappearing on screen and walking back along St. Marks Avenue to New York Avenue. (*Id.* 51-54; 196-198.)  The video also showed petitioner later entering the nearby building where Toon said petitioner lived. (*Id.* 54, 82-83.)

Later that night, Detective McKiernan arrived at the 77th police precinct, where officers were questioning witnesses to the stabbing.  (Trial Tr. 132-34.)  Though Brown did not see petitioner's face, he was able to provide a detailed description of the perpetrator's physical appearance, approximating him at five feet, nine inches tall, and one hundred and fifty pounds.

(*Id.* 190.)  Brown also described the clothing the perpetrator was wearing: black sneakers, blue jeans, a black t-shirt, and black, brimless headwear that covered his forehead to his eyebrows.  (*Id.* 199:7-8.)  Although Toon refused to speak with the police at first, she later submitted herself to a recorded interview at the Kings County District Attorney's Office ("DA") to discuss what occurred the night of the incident.  (*Id.* 55-56.)  Two other witnesses to the stabbing refused to cooperate with the police, and left the precinct.  (*Id.* 134.)

On May 14, 2007, Detective McKiernan interviewed Toon. Toon said she had known petitioner for about a year prior to the incident, and noted that he had an identical twin brother. (Trial Tr. 39, 135.)  Toon claimed she could distinguish petitioner from his brother based on differences in their "facial structures," (*id.* 40:16-23, 92), including a scar on petitioner's forehead.  (*Id.* 140:8-10.)  Based on Toon's statement, Detective McKiernan submitted a "Wanted Card" for petitioner's arrest. (*Id.* 136.)

On May 17, 2007, petitioner, accompanied by his attorney, surrendered himself at the 77th Precinct.  (Trial Tr. 136:16-25.)  Detective McKiernan conducted two lineups that day, and asked Belinda Toon and Jeimar Brown each to separately identify Duncanson's assailant.  (*Id.* 141:1-8.)  Toon was able to clearly identify petitioner as the perpetrator, though Brown

could not. (*Id.* 56:20-24; 202:15-21.) While processing petitioner's arrest, however, Detective McKiernan noted that petitioner's weight and height almost exactly matched Brown's description of the assailant's physique. (*Id.* 147-148.) Subsequently, the Medical Examiner's Office analyzed the DNA from bloodstains found on clothing worn by Toon and Duncanson on the night of the stabbing, along with a sample of petitioner's DNA. The medical examiner's report determined that none of the blood stains contained petitioner's DNA. (*Id.* 265:10-11.)

## II.   Trial, Conviction, and Sentence

A Grand Jury in Kings County returned an indictment charging petitioner for Murder in the Second Degree (*see* New York Penal Law ("NYPL") § 125.25(1)), Murder in the Second Degree as a Hate Crime (*see* NYPL §§ 125.25(1), 485.05(1)(B)), and Criminal Possession of a Weapon in the Fourth Degree (*see* NYPL § 265.01(2)). (Trial Tr. 12:14-16.)[4] Petitioner was tried before a jury from March 10 through March 18, 2009, in New York Supreme Court, Kings County before Justice Neil Firetog. (*See generally* Trial Tr.) Benjamin Heinrich, Esq. was petitioner's trial counsel. (*Id.*)

At trial, defense counsel attempted to impeach Toon's credibility and question the reliability of her identification

---

[4]     The defense twice moved to dismiss all counts of the indictment. (*Id.* 208-219; 244; 261.) The court dismissed the charge of Murder as a Hate Crime, but refused to dismiss the count of Murder in the Second Degree. (*Id.* 261:5-6.)

of petitioner as Duncanson's killer.  For example, Toon initially stated at trial that she had known petitioner and his brother for a year prior to the stabbing, and had seen them almost every day in that period (Tr. 39-40), but defense counsel introduced Toon's prior grand jury testimony that she had actually only known petitioner for "a couple of months."  (*Id.* 68-69.)  Toon further acknowledged that, on the night of the incident, she did not know petitioner or his identical twin brother, Omari Willock, by their real names, but rather, by their interchangeable nicknames, "Twinny or Trinny."  (*Id.* 70, 72.)  Defense counsel also elicited testimony from Detective McKiernan that, on May 14, 2007, Toon had identified Omari Willock as the "good twin" (*id.* 150), even though Toon testified at trial that she considered petitioner to be the "good twin." (*Id.* 92-93.)

Defense counsel further advanced a mistaken identity defense by seeking to introduce testimony of the detective investigating an unrelated stabbing in Manhattan, allegedly committed by petitioner's identical twin brother. (Trial Tr. 220:5-25, 222.)  The court precluded defense counsel's proffered testimony, however.  The court first noted that, in order to introduce evidence of an unrelated stabbing to prove the existence of an alternative perpetrator, the "modus operandi must be so unique as to conclude the same person did it."  (*Id.*

at 225:24-25.)  The trial court found that a stabbing, taken alone, was too generic to constitute evidence of a modus operandi, and the two incidents in question were too dissimilar to be considered probative of identity.  (*Id.* 222-26.)[5]  Further, the charges against petitioner's twin brother had been dropped by the time of trial.  (*Id.* 224:4-5.)

On March 18, 2009, the last day of petitioner's trial, the jury requested further instruction on the element of intent. Specifically, the jury asked: "Is it possible during an altercation, can a charge escalate from manslaughter to murder; or is it decided from the beginning of the incident?"  (Trial Tr. 382:25-383:1-3.)  Justice Firetog addressed the jury's inquiry with defense counsel and the prosecution, outside of the jury's presence, and stated:

> It seems to me if I read them the intent charge, intent does not require premeditation. In other words, intent does not require contemplation nor that the intent be in the person's mind for any particular period of time. The intent can be formed and need only exist at the very moment the person engages in prohibit[ed] conduct or act to cause the prohibit[ed] result and not at any other time.

---

[5]     The trial court categorized the evidence proffered by defense counsel as "reverse *Molineux*" evidence.  (*Id.* 222:16-17.)  "Reverse *Molineux*" evidence refers to "evidence that a third party has committed bad acts similar to those the defendant is charged with committing."  *People v. DiPippo*, 27 N.Y.3d 127, 138 (N.Y. 2016).  The Court of Appeals has held that "reverse *Molineux*" evidence "is relevant to, and can support, a third-party culpability proffer where the crimes reflect a 'modus operandi' connecting the third party to the charged crimes," which typically requires that "similarities were unusual enough to compel the inference that the [same individual] committed both [crimes]."  *Id.* at 138-39 (citations omitted).

(*Id.* 383:3-9.)  Justice Firetog added that the issue was not whether a defendant's intent changed.  The core inquiry, rather, was defendant's *mens rea* "at the time the act was committed." (*Id.* 383:13-15.)  In short, the answer to the jury's question was "yes."  (*Id.* 383:15.)  Once the jury was seated, the court charged jurors with the following expanded intent instruction: "When we're talking about intent, intent can be formed at any time, and one thing can escalate to another or vice versa." (*Id.* 384:10-12.)  Defense counsel did not object to the trial court's supplemental instruction on intent when the jury was charged, or when Justice Firetog previewed the expanded intent instruction to counsel before the jury returned to the courtroom.  (*See generally id.* 382-92.)

Later that day, after deliberations, the jury returned a unanimous verdict of guilty on the charge of Murder in the Second Degree.  (Trial Tr. 389:18.)  On July 6, 2009, the court sentenced petitioner to a prison term of twenty-three years to life.  (ECF No. 5-2, *People v. Willock*, Sentencing Transcript dated July, 6, 2009 ("Sent. Tr.") 14:3-4.)[6]

## III.  Post-Conviction Proceedings

### A. Direct Appeal

---

[6]    The transcript for petitioner's sentencing is available at ECF No. 5-2, ECF pp. 138-52.

On July 28, 2014, petitioner appealed his judgment of conviction to the New York Supreme Court, Appellate Division, Second Department.  (Aff. in Opp. 14.)  Petitioner, represented by appellate counsel, Gail Grey, Esq., appealed on four grounds: (1) the guilty verdict was against the weight of the credible evidence; (2) the trial judge precluded exculpatory identification evidence, thereby undermining petitioner's right to defend the People's charges; (3) the trial court's supplemental instructions on the element of intent, provided in response to a jury note, deprived petitioner of a fair trial and his right to due process; and (4) petitioner received an unconstitutionally harsh and excessive sentence that failed to consider his youth at the time of the stabbing.  (*Id.* 14-15; Pet. 3.)

On February 18, 2015, the Appellate Division unanimously affirmed petitioner's conviction.  *People v. Willock*, 125 A.D.3d 901 (N.Y. App. Div. 2d Dep't 2015).  The panel first rejected petitioner's argument that his conviction was against the weight of the evidence.  *Id.* at 902.  Upon an independent review of the trial record, the Appellate Division observed:

> [T]here was testimony from an eyewitness who knew the [petitioner] and his identical twin brother from the neighborhood, and saw the [petitioner] almost every day. She was present during the altercation between the [petitioner] and the victim, and she even tried to

> break up the fight. This eyewitness testified that the
> [petitioner], not his twin brother, fought with the
> victim. She explained that she could tell the twins
> apart because they had different facial structures.
> Contrary to the [petitioner]'s contention, her
> testimony was not incredible or unreliable.

*Id.* at 902.

The Appellate Division next addressed the trial court's preclusion of evidence that petitioner's identical twin brother was investigated for stabbing a coworker. *Id.* The panel concurred with the trial judge's decision not to admit petitioner's "reverse *Molineux*" evidence because the proffered testimony "was not sufficiently probative to outweigh the countervailing risks of trial delay, undue prejudice, confusing the issues, or misleading the jury." *Id.* The court added that:

> [t]he mere fact that the [petitioner]'s brother had
> been investigated for stabbing a coworker did not
> significantly increase the chance that he committed
> the instant crime. Further, there was no showing that
> the stabbing incidents were sufficiently similar to
> support the inference that the defendant's twin
> brother, rather than the defendant himself, may have
> committed the instant crime.

*Id.* at 902-03 (internal citation omitted).

Lastly, the Second Department found that petitioner's challenge to the trial court's expanded intent instruction was both unpreserved for appellate review and without merit, and that petitioner's sentence was not excessive. (*Id.* at 903.) Petitioner thereafter sought leave to appeal to the New York Court of Appeals. On October 30, 2015, the Court of Appeals

denied petitioner's application.  *People v. Willock*, 26 N.Y.3d 1012 (N.Y. 2015).  The time to seek review in the United States Supreme Court expired on January 28, 2016.  *See* 28 U.S.C. § 2101(d); Sup. Ct. R. 13(1).

## B. 440.10 Motion

On May 17, 2019, petitioner moved *pro se* to vacate his conviction under New York Criminal Procedure Law ("CPL") § 440.10(g), based on "newly discovered evidence."  (ECF No. 16-2, Memorandum of Law in Support of CPL § 440.10 Motion ("440.10 Mot.").)  Petitioner purportedly discovered that Toon, the prosecution's main trial witness, was bribed to testify, as demonstrated by rent payments remitted to Toon pursuant to a relocation agreement with the Kings County DA.  (*Id.*)  On November 18, 2019, Justice Guy J. Mangano, Jr. of the Kings County Supreme Court summarily denied petitioner's motion.  (ECF No. 20-1, *People v. Willock*, Decision and Order dated November 18, 2019.)  Justice Mangano explained that both defense counsel and the trial court were apprised of the relocation agreement before petitioner's sentencing, as well as the threats to Toon that necessitated her relocation in the first place.  (*Id.*) Accordingly, petitioner did not present "newly discovered evidence" under CPL § 440.10(g).[7]

---

[7]     Petitioner's claim was not raised in his direct appeal, and was therefore procedurally barred under CPL §§ 440.10(3)(c) and 440.10(2)(c). (*Id.*)

## C. Petition for *Habeas* Relief

On January 13, 2017, petitioner filed the instant
petition for a writ of *habeas corpus* pursuant to 28 U.S.C. §
2254.  (*See generally* Pet.)  The petitioner's grounds for *habeas*
relief, which are identical to the grounds raised in his direct
appeal before the Appellate Division, are that: (1) the verdict
of guilt was rendered against weight of the evidence; (2) the
trial judge refused to admit exculpatory identification
evidence, thereby precluding petitioner's mistaken
identification defense, by invoking a "reverse *Molineux*"
rationale; (3) the trial court's expanded intent instruction
deprived petitioner of a fair trial and his right to due
process; and (4) petitioner received an unconstitutionally harsh
and excessive near-maximum sentence that failed to meaningfully
consider his youth and attendant circumstances.  (Opp. in Aff.
14-15; Pet. 14-25.)

After respondent filed his opposition, petitioner
requested a stay of proceedings as he sought relief in state
court.  (ECF No. 8.)  The court granted petitioner's motion on
October 18, 2017. (Order dated October 18, 2017.)  In a letter
dated December 18, 2018, petitioner asked the court to appoint
counsel to represent him for his 440.10 motion in state court
(ECF No. 13), but the court denied petitioner's motion.  (Order
dated April 9, 2019.)  On May 30, 2019, petitioner requested

reinstatement of the stay previously ordered by the court, until such time as a decision issued on his 440.10 motion.  (ECF No. 16.)  The court denied this request as well.  (Order dated July 23, 2019.)  On September 3, 2019, petitioner filed his reply to the State's opposition.  (ECF No. 19, Reply.)

## **LEGAL STANDARD**

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for a writ of *habeas corpus* by a person in state custody may only be brought on the grounds that his or her custody is "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A *habeas* petitioner is required to show that the state court decision, having been adjudicated on the merits, is either "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 568 U.S. 289 (2013).

For the purposes of federal *habeas* review, "clearly established law" is defined as "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  A state court decision is "contrary to," or an

14

"unreasonable application of," clearly established federal law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412-13.  Factual determinations made by the state court are presumed to be correct, and a petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

A federal court "will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Downs v. Lape*, 657 F.3d 97, 101-02 (2d Cir. 2011) (quoting *Cone v. Bell*, 556 U.S. 449, 465 (2009)); *see also Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  Federal review is barred whenever "a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim."  *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990).  Lastly, the rule applies "whether the state law ground is substantive or procedural."  *Coleman*, 501 U.S. at 729.

A federal district court may not grant a *habeas* petition made by an individual in state custody pursuant to § 2254 unless "the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A). This requirement is "grounded in . . . concerns for federalism and comity between the state and federal sovereigns . . . [and] ensures that federal courts respect the States' interest in correcting their own mistakes." *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (citations and internal quotation marks omitted) (quoting *Coleman*, 501 U.S. at 732).  To meet the exhaustion prerequisite, a petitioner must have "(i) presented the federal constitutional claim asserted in the [*habeas*] petition to the highest state court (after preserving it as required by state law in the lower courts) and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim." *Ramirez v. Attorney Gen. of N.Y.*, 280 F.3d 87, 94 (2d Cir. 2001) (citing, *inter alia, Picard v. Connor*, 404 U.S. 270, 276-77 (1971)).

State procedural default will operate as a bar to review unless the petitioner can (1) establish cause for his default and actual prejudice resulting from the alleged violation of federal law, or (2) demonstrate that the failure to consider the petitioner's claims would result in a fundamental miscarriage of justice. *See Gutierrez v. Smith*, 702 F.3d 103,

111 (2d Cir. 2012); *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011). A petitioner may fulfill the cause requirement in two related ways. First, the petitioner can demonstrate that "some objective factor, external to Petitioner's defense, interfered with his ability to comply with the state's procedural rule." *Gutierrez*, 702 F.3d at 111 (citing *McClesky v. Zant*, 499 U.S. 467, 493 (1991)). Alternatively, the petitioner can establish cause by demonstrating futility — specifically, that "prior state case law has consistently rejected a particular constitutional claim." *Id.* (citing *DiSimone v. Phillips*, 461 F.3d 181, 191 (2d Cir. 2006)). To establish prejudice, the petitioner must demonstrate that the alleged error resulted in "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (internal quotation marks and citation omitted).

Even if the petitioner is unable to establish cause and prejudice, the procedural default may be excused if he can show that a fundamental miscarriage of justice would result, *i.e.*, "that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citations omitted). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.*

(alteration in original, internal quotation marks omitted)

(quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

In reviewing the instant petition, the court is also mindful that "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (internal quotation marks and citations omitted); *Williams v. Kullman,* 722 F.2d 1048, 1050 (2d Cir. 1983) (noting that courts should review *pro se habeas* petitions with a lenient eye). Accordingly, the court is obliged to interpret petitioner's pleadings as raising the strongest arguments they suggest. *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009); *Martin v. United States,* 834 F. Supp. 2d 115, 119 (E.D.N.Y. 2011) (citing *Williams,* 722 F.2d at 1050).

## DISCUSSION

The parties do not dispute that petitioner has exhausted his claims for *habeas* relief. (*See* Opp. 4 n.19.)  Nor does respondent challenge the timeliness of the petition.  The court will therefore address petitioner's procedural default first, before turning to the merits.

## I.  Procedural Default

Petitioner asserts the trial court's supplemental instruction on the element of intent deprived him of a fair

trial and his right to due process. (Pet. 14.) The Appellate
Division denied the same claim on direct appeal as "unpreserved
for appellate review (*see* CPL 470.05[2]) and, in any event, . .
. without merit." *Willock*, 125 A.D.3d at 903. The court
concurs, and finds petitioner's claim procedurally barred.

Under CPL § 470.05(2), a criminal defendant seeking to
preserve a claim of error, must object to the challenged ruling
"at the time of such ruling . . . or at any subsequent time when
the [trial] court had an opportunity of effectively changing the
same." *Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011)
(quoting CPL § 470.05(2)). Errors of law must be timely
presented "in a manner that reasonably prompts a judge to
correct them during criminal proceedings." *Downs*, 657 F.3d at
103-04; *accord People v. Luperon*, 647 N.E.2d 1243, 1246-47 (N.Y.
1995) ("[A]ny matter which a party wishes the appellate court to
decide [must] have been brought to the attention of the trial
court at a time and in a way that gave the latter the
opportunity to remedy the problem and thereby avert reversible
error."). Failure to preserve a claim by contemporaneous
objection thus bars further challenge on *habeas* review. Defense
counsel did not object to Justice Firetog's supplemental
instruction on intent before or after the jury was charged.
(*See generally* Tr. 382-92.) Nor did defense counsel challenge
the validity of the court's instruction at the subsequent

19

sentencing hearing, despite taking that opportunity to levy an objection regarding petitioner's "reverse *Molineux*" claim.  The Appellate Division thus denied review of Justice Firetog's supplemental instruction under CPL § 470.05(2) as unpreserved.

The court is nevertheless mindful that, despite the dismissal of petitioner's claim on an independent state law ground, the court still has a duty to "scrutinize the application of state rules that bar our review of federal claims." *Cone,* 556 U.S. at 468.  A state law rule is adequate if it is "firmly established and regularly followed," and "serves legitimate state interests." *Downs*, 657 F.3d at 104; *El Rhagi v. Artuz*, 309 F.3d 103, 107 (2d Cir. 2002) (quoting *Garcia v. Lewis*, 188 F.3d 71, 77-78 (2d Cir. 1999)) ("The relevant question [in determining adequacy] is not whether the state court was 'right or wrong' in its decision, but rather whether its holding had a 'fair or substantial basis in state law.'"). The Second Circuit has consistently deemed New York's contemporaneous objection rule "firmly established and regularly followed" by New York State, and thus an "adequate" state ground that precludes federal *habeas* review of a claim's underlying merits. *Ercole*, 642 F.3d at 286; *see also Zarvela v. Artuz,* 364 F.3d 415, 419 (2d Cir. 2004) (finding petitioner's claim that jury instructions violated his right to a fair trial was procedurally defaulted for lack of contemporaneous objection);

*Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996)

("[P]rocedural default in the state court will . . . bar federal
habeas review when the last state court rendering a judgment in
the case clearly and expressly states that its judgment rests on
a state procedural bar.") (internal quotation marks omitted).

Further, although an otherwise "adequate" state law
may be rendered "inadequate" in instances of "exorbitant
application," the instant case does not fall within that narrow
and "exceptional" category. *Lee v. Kemna*, 534 U.S. 362, 376
(2002) (citation omitted); *Morgan v. Perez*, No.
117CV05460PKCKHP, 2018 WL 7291453, at *8 (S.D.N.Y. Nov. 9,
2018), *report and recommendation adopted*, No. 17CV5460PKCKHP,
2019 WL 101687 (S.D.N.Y. Jan. 4, 2019).  To gauge whether a
state law has been exorbitantly applied, the Supreme Court
considers whether: (1) perfect compliance with the state law
rule would have changed the trial court's decision; (2) state
law indicated that compliance with the rule was required under
these circumstances; and (3) petitioner substantially complied
with the rule given the "realities of trial."  *Lee*, 534 U.S. at
381-382.

None of the above factors suggests a remotely
improper, much less exhorbitant application, of the
contemporaneous objection rule.  *First*, the Second Circuit has
observed that it is "impossible to conclusively determine"

without a "certain degree of speculation" whether absolute
adherence to the contemporaneous objection rule would have
altered a case's outcome. *Ercole*, 642 F.3d at 289 (internal
quotations omitted). Even so, Justice Firetog's supplemental
instruction with respect to intent does not evince legal error.
In fact, the expanded intent charge given to the jury here
substantially conforms to the New York State Criminal Jury
Instructions, *see* CJI2d[NY] Culpable Mental States-Intent,[8] and a
similar charge has withstood appellate scrutiny. *See People v.
Vernick-Chaikin*, 52 Misc. 3d 143(A) (N.Y. App. Term. 2016),
*leave to appeal denied*, 28 N.Y.3d 1127 (N.Y. Dec. 19, 2016).
*Second*, New York courts have typically applied the
contemporaneous objection rule in similar circumstances. *See,
e.g.*, *People v. Colon*, 46 A.D.3d 260 (N.Y. App. Div. 1st Dep't
2007) (defendant's claim was not preserved for appellate review
where the court "expressly decided" a question in response to
the jury's inquiry); *People v. Reyes,* 76 A.D.3d 864 (N.Y. App.
Div. 1st Dep't 2010) (defendant failed to preserve for appellate
review claim that the supplemental instruction given, as to
intent with regard to the burglary count, was incorrect or

---

[8]     The instructions prescribe the following charge:

    Intent does not require premeditation. In other words, intent does not
    require advance planning. Nor is it necessary that the intent be in a
    person's mind for any particular period of time. The intent can be
    formed, and need only exist, at the very moment the person engages in
    prohibited conduct or acts to cause the prohibited result, and not at
    any earlier time.

prejudicially misleading).  *Third*, defense counsel took no
action with respect to the expanded intent charge that could be
construed as substantial compliance.  In other words, the record
does not reflect even a *tardy* objection by defense counsel to
the instruction at issue.  (*See* Trial Tr. 382-92.)

Petitioner nonetheless insists that the trial court's
error was "so fundamental that no objection [was] necessary to
preserve the claim."  (Reply 8.)  Petitioner cites a decades-old
Second Circuit case, *Hawkins v. Lefevre*, 758 F.2d 866 (2d Cir.
1985), to support his contention.  In *Hawkins*, the Second
Circuit articulated a narrow proposition: permitting an adverse
inference against a criminal defendant for exercising his
privilege against self-incrimination at trial is a
"constitutional violation so fundamental that no objection is
necessary to preserve such a claim as an issue of law for
appellate review."  *Id.* at 872-73.  *Hawkins* is inapposite,
however.  The trial court's supplemental jury charge was wholly
unrelated to petitioner's right against self-incrimination.
Notwithstanding *Hawkins*'s limited reach, the trial judge's
expanded intent charge was entirely appropriate, and did not
shift the burden of proof to petitioner, or otherwise undermine
petitioner's right to due process.

Finally, petitioner makes no showing of cause,
prejudice, or actual innocence to overcome his procedural

23

default.  *Coleman*, 501 U.S. at 750; *Dunham*, 313 F.3d at 730

(citing *Schlup v. Delo*, 513 U.S. 298, 321 (1995)).  Accordingly,

petitioner's claim is denied and dismissed as procedurally

barred.

**II.   Petitioner's Remaining Claims Are Meritless**

   **A. Weight of Evidence Violation**

   Petitioner asserts the "verdict of guilt was rendered

against the weight of the evidence where the testimony of the

only identifying witness was hopelessly and scientifically

unreliable." (Pet. 14.)  A "weight of the evidence" argument is

not to be conflated with a legal sufficiency claim.  *See Correa

v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001).  The former

is purely a state law claim, grounded in CPL § 470.15(5); the

latter is based on federal due process principles.  *Id.*  As a

result, petitioner's "weight of the evidence" claim presents no

federal constitutional issue, and thus is not a cognizable basis

for *habeas* relief.  *See McKinnon v. Superintendent, Great Meadow

Corr. Facility*, 422 Fed. Appx. 69, 75 (2d Cir. 2011); *Walker v.

Artus*, 117 F. Supp. 3d 228 (E.D.N.Y. 2015).

   Further, petitioner appears to argue on reply that the

evidence supporting his conviction was legally insufficient

under *Jackson v. Virginia*. (Reply 2.)  The gravamen of a legal

sufficiency claim under *Jackson* is "whether, after viewing the

evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  443 U.S. 307, 319 (1979) (emphasis in original).  A *habeas* petitioner "bears a very heavy burden" in challenging the legal sufficiency of evidence.  *Einaugler v. Supreme Court*, 109 F.3d 836, 840 (2d Cir. 1997).

The crux of petitioner's challenge is that the State's main witness, Belinda Toon, "testified both inconsistently and unreliably."  Specifically, petitioner contends Toon did not satisfactorily establish that she was able to distinguish between petitioner and his identical twin brother:

> She claimed that she was able to identify the perpetrator and distinguish between Mr. Willock and his identical twin brother.  She claimed that she was able to identify Mr. Willock apart from his identical twin brother based on a half an inch scar on his forehead.  She also claimed that she was able to distinguish between the identical twin brothers because of a purported "good" twin bad twin characteristic.  But as it turns out, the perpetrator wore headwear extended to just above his eyebrows on the night of the incident, and Toon testified that she did not know the twin brothers given names or surname, referring to them by joint, "interchangeable" nickname[s]: Trinny or Twinny.

(Reply 2-3 (record citations omitted).)

As an initial matter, under *Jackson*, an "assessment of the credibility of witnesses is generally beyond the scope of review."  *Strogov v. Attorney Gen. of N. Y., By Special Prosecutor for Medicaid Fraud Control*, No. CV 96-2133 (RJD),

1998 WL 229120, at *1 (E.D.N.Y. Mar. 31, 1998), *aff'd sub nom. Strogov v. Attorney Gen. of N.Y.*, 191 F.3d 188 (2d Cir. 1999) (quoting *Schlup,* 513 U.S. at 330).  The Second Circuit has also held that "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction."  *United States v. Frampton*, 382 F.3d 213, 222 (2d Cir. 2004) (quoting *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979)).  Even if the court accepts petitioner's invitation to second-guess the jury's assessment of Toon's credibility, which it will not, it is clear that a juror could have reasonably considered her testimony credible.  Defense counsel did not establish that Toon had a motive to lie about petitioner's role in the stabbing of Duncanson.  Indeed, petitioner and Toon were apparently acquaintances on friendly terms, whereas Duncanson was a stranger to Toon.  Toon's testimony was also corroborated by Brown's description of petitioner's physical characteristics, and video evidence that placed an individual matching petitioner's physical description at the scene of the crime.  Though defense counsel identified an inconsistency in Toon's testimony with respect to how long she knew the petitioner, even if Toon only knew petitioner for two months at the time of the incident, and not one year, a jury could have rationally found the shorter period of time was sufficient to establish familiarity with petitioner's distinct appearance.  Most

critically, Toon was in petitioner's company in the minutes immediately preceding the stabbing incident, and was in the thick of his altercation with Duncanson, as she tried to restrain petitioner.  Petitioner also seizes on the fact that petitioner's forehead scar was concealed by headwear on the night of the incident, and that Toon was able to distinguish petitioner from his brother based, in part, on that facial feature.  But Toon did not testify that she identified petitioner as Duncanson's killer based on the scar.  She merely stated that the scar was one feature that distinguished petitioner from his brother.  In the aggregate, a rational jury could have credited Toon's ability to distinguish between petitioner and his twin brother, and her identification of petitioner as Duncanson's killer.  Accordingly, petitioner's claim challenging the weight and sufficiency of the evidence is dismissed.

### B. Preclusion of Mistaken Identity Defense

Petitioner challenges the trial court's preclusion of evidence of potential third-party culpability as a violation of his constitutional right to present a complete defense.  (Pet. 16.)  Applying AEDPA deference, the court considers whether the state court's adjudication on the merits "was contrary to, or involved an unreasonable application of, clearly established, federal law."  28 U.S.C. § 2254(d)(1).  A criminal defendant has

a "constitutional right grounded in the Sixth Amendment's Compulsory Process and Confrontation Clauses and the Fourteenth Amendment's Due Process Clause to a meaningful opportunity to present a complete defense." *Hawkins v. Costello,* 460 F.3d 238, 243 (2d Cir. 2006) (quoting *Crane v. Kentucky,* 476 U.S. 683, 690 (1986)); *see also Washington v. Schriver,* 255 F.3d 45, 56 (2d Cir. 2001) ("The right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.")).  This right, however, is subject to "reasonable restrictions." *Wade v. Mantello*, 333 F.3d 51, 58 (2d Cir. 2003) (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).  Namely, a criminal defendant must comply "with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Buie v. Phillips*, 298 F. App'x 63, 65 (2d Cir. 2008) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).  Indeed, the Supreme Court has acknowledged that the Constitution grants state legislatures "broad latitude" to enact rules for exclusion of evidence in criminal trials. *Holmes v. South Carolina,* 547 U.S. 319, 324 (2006).  Thus, federal district judges must exhibit caution when asked to "impose constitutional constraints on ordinary evidentiary rulings by

state trial courts." *Connelly v. Senkowswki*, No. 07-CV-
4616(CBA), 2012 WL 5463915, at *7 (E.D.N.Y. Nov. 8, 2012)
(citing *Crane*, 476 U.S. at 689)).

"In considering whether the exclusion of evidence
violated a defendant's right to present a complete defense, we
start with 'the propriety of the trial court's evidentiary
ruling.'" *Hawkins*, 460 F.3d at 244 (quoting *Wade*, 333 F.3d at
59).  If evidence was erroneously excluded, the court looks to
"'whether the omitted evidence [evaluated in the context of the
entire record] creates a reasonable doubt that did not otherwise
exist.'"  *Id.* (internal quotations omitted) (quoting *Justice v.
Hoke*, 90 F.3d 43, 47 (2d Cir. 1996)).  However, where an
evidentiary ruling was correct pursuant to a state evidentiary
rule, a *habeas* court's inquiry is limited to whether the
evidentiary rule is "arbitrary" or "disproportionate to the
purposes [it is] designed to serve."  *Id.* (citations omitted).
A state evidentiary rule will be deemed "unconstitutionally
arbitrary or disproportionate only where it has infringed upon a
weighty interest of the accused."  *United States v. Scheffer*,
523 U.S. 303, 308 (1998).

1. <u>Propriety of the Trial Court's Evidentiary Ruling</u>

The trial court's preclusion of petitioner's third-
party culpability evidence was not erroneous as a matter of New
York law.  With the jury recessed, the trial court entertained

29

defense counsel's offer to adduce evidence regarding an unrelated stabbing, which implicated petitioner's identical twin brother, and then heard the prosecution's response.  (*See* Trial Tr. 220-27.)  *Cf. People v. Schultz*, 4 N.Y.3d 521, 528 (N.Y. 2005) (court must allow the defense to make an "offer of proof outside the presence of the jury for how it would introduce evidence of third-party culpability," and then allow the prosecutor to make counter-arguments); *People v. Powell,* 27 N.Y.3d 523 (N.Y. 2016) (trial court's preclusion of offer of proof for admitting third-party culpability evidence was proper where murder defendant's theory was speculative).

Under New York law, the admission or exclusion of third-party culpability evidence turns on a balancing of the evidence's probative value against "countervailing risks of trial delay, undue prejudice to the opposing party, and confusing the issues or misleading the jury."  *People v. DiPippo*, 50 N.E.3d 888, 893 (N.Y. 2016) (quoting *People v. Primo*, 96 N.Y.2d 351, 356 (N.Y. 2001)).  Evidence of third-party guilt "may not rest on mere suspicion or surmise."  *Primo*, 96 N.Y.2d at 357.  Applying these principles, New York courts have consistently rejected attempts to admit speculative evidence of third-party culpability.  *See, e.g.*, *Devaughn v. Graham*, No. 14-CV-2322 (NGG), 2017 WL 244837, at *13 (E.D.N.Y. Jan. 19, 2017); *Schultz*, 4 N.Y.3d at 528 (third-party culpability evidence that

was wholly speculative and would have caused undue delay, prejudice and confusion was properly excluded); *People v. Upson,* 103 A.D.3d 924, 924 (N.Y. App. Div. 2d Dep't 2013) ("The County court providently exercised its discretion in precluding certain evidence of third-party culpability.").

      At trial, defense counsel attempted to introduce testimony by a detective who had investigated an unrelated stabbing in Manhattan, which implicated the petitioner's identical twin brother.  (Trial Tr. 272, 276-279.)  Justice Firetog properly applied the "general balancing analysis that governs the admissibility of all evidence," *Primo*, 753 N.E.2d at 168, when he decided not to allow the defense's third-party culpability evidence.  The sole commonality between the Manhattan stabbing and Duncanson's killing was the use of knives. Setting aside the obvious fact that the incidents occurred in separate boroughs, the former incident involved a non-fatal assault on a coworker at a place of employment; the instant stabbing was a street fight between strangers, in which the perpetrator uttered a homophobic slur and caused the victim's death.  *See id.,* 96 N.Y.2d at 355 (third-party culpability evidence requires "nearness in time, place, and circumstances to the alleged crime") (citation omitted): *see also Schultz*, 4 N.Y.3d at 529 (evidence of "remote acts, disconnected and outside of the crime itself," to show that

someone other than the defendant committed the crime, properly excluded) (quoting *Greenfield v. People,* 85 NY 75, 89 (N.Y. 1881)).  Justice Firetog reasonably determined that defense counsel's proffered testimony could have confused the issues, misled the jury, and resulted in trial delays.  For example, had the evidence of an unrelated stabbing been adduced at trial, the jury could have been diverted from determining petitioner's guilt or innocence, and instead, may have turned its attention to the irrelevant issue of his twin brother's character.  Or the jury could have associated two unrelated stabbings where there was no showing they had any connection.  *See Schultz*, 4 N.Y.3d at 528.  Accordingly, the court finds that defendant's proffered evidence of third-party culpability was appropriately excluded under New York law, and did not wrongfully preclude petitioner from asserting his defense of mistaken identity at trial.

      2. <u>Infringement on a Weighty Interest</u>

      Given the propriety of the trial court's ruling under New York evidentiary law, the court's subsequent inquiry is confined to determining whether the law itself is "arbitrary" or "infringed upon a weighty interest of the accused."  *Hawkins*, 460 F.3d at 244.  Here, the trial court applied a "well-established rule[] of evidence [that] permit[s] trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues,

or potential to mislead the jury." *Livingston v. Brown*, No. 07-CV-7172 KMK GAY, 2012 WL 4477550, at *9 (S.D.N.Y. Sept. 27, 2012) (quoting *Holmes,* 547 U.S. at 326); *cf.* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). The Supreme Court has held that such rules are neither arbitrary, nor do they infringe on a weighty interest of the accused. *Holmes*, 547 U.S. at 326. In addition, courts have held that the exclusion of speculative third-party culpability evidence does not "infringe[] upon a weighty interest of the accused." *DeVaughn*, 2017 WL 244837, at *14 (citing *Collins v. Barto*, No. 05-CV-9387 (RWS), 2007 WL 2398778, at *13-14 (S.D.N.Y. Aug. 14, 2007)).

Petitioner's claim is thus denied.

### C. Excessive Sentence

Petitioner argues that the trial court ran afoul of his Eighth Amendment right against cruel and unusual punishment by imposing a near-maximum sentence that failed to account for petitioner's age at the time of the offense. (Pet. 24.) As a threshold matter, sentencing court decisions are accorded substantial deference and challenges to them rarely prevail. *See Hutto v. Davis*, 454 U.S. 370, 374 (1982) (per curiam);

33

*Edwards v. Marshall*, 589 F. Supp. 2d 276, 290 (S.D.N.Y. 2008)
(quoting *United States v. Persico,* 853 F.2d 134, 138 (2d Cir.
1988)).  This case is no exception.

The Second Circuit has stated that "no federal
constitutional issue is presented where . . . the sentence is
within the range prescribed by state law." *White v. Keane*, 969
F.2d 1381, 1383 (2d Cir. 1992).  Under New York Penal Law, a
conviction for Murder in the Second Degree carries a maximum
term of life imprisonment, and a minimum term ranging from
fifteen to twenty-five years.  NYPL § 70.00(2)(a), (3)(a)(i).
The trial court sentenced petitioner to a prison term of twenty-
three years to life (Sent. Tr. 14:3-4), squarely within the
range authorized by New York law.  *See Ortiz v. Rock*, No. 09-CV-
679 (PKC), 2016 WL 6068808, at *6 (E.D.N.Y. Oct. 13, 2016)
(petitioner, who was 17 at time of sentencing, denied *habeas*
relief because sentence of 25 years to life was within range
prescribed by New York law for Murder in the Second Degree).

Petitioner's remaining arguments lack merit.  On reply,
petitioner contends the sentencing court violated his right to
due process by neglecting to make a youthful offender
determination. (Reply 9 (citing *People v. Rudolph*, 21 N.Y.3d 497
(N.Y. 2013)).)  A youthful offender determination pursuant to
CPL § 720.20 is solely an issue of state law, however, and
therefore not cognizable on federal *habeas* review.  *Murphy v.*

34

*Costello*, 2011 WL 250388, at *8 (E.D.N.Y. Jan. 26, 2011)

("[Y]outhful offender status is purely a question of state law,

and it is thus not amenable to federal habeas review."); *accord*

*Concepcion v. Martuscello*, 16 Civ. 5918 (LAP)(GWG), 2017 WL

4536087, at *8 (S.D.N.Y. Oct. 11, 2017).  Petitioner also cites

to the Supreme Court's decision in *Montgomery v. Louisiana*, 136

S. Ct. 718 (2016), to support his contention that the sentencing

court violated his constitutional rights by failing to consider

his youth and attendant circumstances.  (Reply 8.)  In

*Montgomery*, the Supreme Court retroactively extended the holding

of *Miller v. Alabama*, 567 U.S. 460 (2012), which prohibited

mandatory sentences of life without the possibility of parole

for those who were juveniles at the time of their crimes.  Here,

petitioner is eligible for parole after 23 years.  Thus, *Miller*

and *Montgomery* are both inapposite.  Petitioner's claim that his

sentence was excessive is therefore denied.

## CONCLUSION

        For the reasons stated above, the petition for a writ

of *habeas corpus* is DENIED in its entirety.  Petitioner's third

claim, which challenges the trial's court supplemental jury

instruction regarding intent, is procedurally barred, and was

rejected by the Appellate Division on independent and adequate

state law grounds.  Petitioner has not shown cause and prejudice

to justify consideration of the petition's procedurally barred

claim, nor has he demonstrated that he is "actually innocent" of the offense of conviction.  Petitioner's remaining claims are meritless.  Thus, the petition for a writ of *habeas corpus* is DENIED and this case is DISMISSED.  A certificate of appealability shall not issue because petitioner has not made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).

The clerk is respectfully directed to enter judgment in favor of respondent, close this case, and send a copy of this Memorandum and Order and the judgment to the petitioner at his last known address and note service on the docket.

**SO ORDERED.**

Dated:     May 27, 2020
           Brooklyn, New York

                                        /s/
                              _____
                              Hon. Kiyo A. Matsumoto
                              United States District Judge